18241

UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant, v. The FIRST NATIONAL BANK OF SOUTH CAROLINA OF COLUMBIA, Respondent.

(137 S. E. (2d) 582)

*Messrs. Roger M. Heyward* and *Bernard Manning*, of Columbia, *for Appellant,*

*Messrs. Boyd, Bruton & Lumpkin, Charles W. Knowlton* and *Kirkman Finlay, Jr.,* of Columbia, *for Respondent,*

*Messrs. Roger M. Heyward* and *Bernard Manning,* of Columbia, *for Appellant, in Reply,*

July 21, 1964.

Bussey, Justice.

In· this action appellant, as subrogee of Southern States Construction Company (hereinafter simply called the company), by virtue of having paid a claim under a fidelity bond issued to the said company covering its employees, sought to recover from the respondent (which will hereinafter be referred to, simply as the bank) the amount of the claim paid by it, plus interest and costs. The defalcation of an employee of the company involved a total of twenty.-six checks handled by the respondent bank and involved certain forgeries and alterations, which will hereinafter be discussed in more detail.

By consent, the action was referred to the Master in Equity for Richland County, who,. after taking the evidence, concluded that appellant was entitled to, and recommended that appellant recover judgment in the amount of $306.31, on account of a check forged on the account of the company in the amount of $105.08, paid by the bank on March 3, 1961, and another like check in the amount of $201.23, paid

on April 3, 1961. As to the remaining twenty-four checks, the master concluded that appellant was not entitled to recover.

Only the appellant excepted to the master's report, which, incidentally, is not in the record; nor are the exceptions of the appellant thereto included in the record. The record contains a summary of the testimony of the witnesses, rather than the verbatim testimony.

The master's report was confirmed in its entirety by the circuit judge. The master apparently found, and certainly the circuit judge found, as matters of fact, that the respondent bank was not negligent in connection with the remaining twenty-four checks; that the company was extremely negligent in various particulars, and that the loss or losses were caused or brought about by the negligence of the company. This appeal is from the order of the circuit judge confirming the master's report.

With respect to three of the checks involved, appellant abandoned its contentions, so that on appeal there are involved twenty-one checks in the total amount, according to appellant's brief, of $7,584.34. Additionally involved is the question of whether the appellant is entitled to interest on such amount or amounts as the bank may be liable for.

The exceptions of the appellant are thirty-two in number, occupying more than eleven pages in the printed record. Some of them are broken down into as many as seven subheadings and some fail to comply with Section 6 of Rule 4 of the Supreme Court. In addition, appellant's 84 page brief states the questions involved as being nine in number, and then fails to comply with Section 3 of Rule 8 in that the several headings fail to refer to the specific exception or exceptions alleged to raise the questions being considered therein. Compliance with the last cited rule is always important, and particularly so in a case where, as here, there are such numerous exceptions, some of them not properly framed, and such a copious brief. Failure to comply therewith places an

undue burden on this court in studying the exceptions and the briefs in order to determine what issues, if any, are properly before the court on appeal. In this case we would be fully justified in dismissing the entire appeal for failure to comply with the last cited rule, but refrain from doing so because no previous decision has come to our attention wherein this court has passed upon the effect of failure to comply with Section 3 of Rule 8.

While the appellant's contentions are numerous, it concedes that a depositor may be estopped by negligent conduct from recovering against a bank which would otherwise be liable for honoring forged or altered checks. It asserts, however, that in order for a bank to avoid liability on the basis of estoppel, it is incumbent upon the bank to affirmatively show that it exercised due diligence, was free of negligence, and not only that the depositor was negligent, but that depositor's negligence was the proximate cause of the payment of the checks and resultant damage. In support of this contention appellant cites, *inter alia,* 9 C. J. S., 730, Banks and Banking § 356, p. 10, Am. Jur. (2d) 490, Banks, Section 519; and *Hair v. Winnsboro Bank,* 103 S. C. 343, 88 S. E. 26, where this court approved the trial judge's charge as being a proper and full statement of the applicable law, which charge is reported in the South Carolina Reports, but not in the South Eastern Reporter. Also cited is the case of *Carroll v. South Carolina National Bank,* 211 S. C. 406, 45 S. E. (2d) 729.

The citations from C. J. S. and American Jurisprudence fully support appellant's contention as to the proper and general rule. The *Hair case* is authority for the proposition that it was incumbent upon the bank to show negligence on the part of the depositor and that such negligence had caused the loss, but did not specifically deal with any affirmative showing of lack of negligence on the part of the bank. The *Carroll case,* however, which dealt with the payment of a check by the bank after it had been ordered stopped, rather than a forgery or alteration, clearly tends to support ap-

pellant's contention as to what a bank must affirmatively prove in order to avoid liability where it has paid forged or altered checks. Briefly stated, appellant's exceptions assert that the essential elements of estoppel were not established by the evidence.

In a law case, findings of fact by the circuit judge are ■■ not reviewable by this court if there is any evidence whatever to support such findings. *Weston v. Morgan,* 162 S. C. 177, 160 S. E. 436. See also numerous cases in West's Digest, Appeal and Error, 1022. As to all factual issues passed upon by the trial judge, the question before this court is not whether the evidence would support contrary findings, but whether there is any evidence to support the findings actually made.

In the light of the foregoing principles we proceed to consider the evidence in the record and the facts disclosed thereby, which are as follows:

Some time apparently during the year 1957, the exact date not appearing in the record, the company employed as a bookkeeper a woman by the name of Kietel. The two principal officers of the company were Mr. Dial and Mr. Thomas, they being the only persons authorized to sign checks for the company, each of whom could sign individually. Kietel, in addition to keeping books, prepared for issuance all, or substantially all, of the checks of the company, which were signed by either Dial or Thomas. She attended to depositing money in banks for the company; picked up all of the canceled checks, and reconciled the bank accounts, all without any supervision from Dial, Thomas or anyone else. It was a frequent practice for both Dial and Thomas to sign company checks for Kietel which were only partially filled in by Kietel.

Kietel's first defalcation, as far as the record shows, occurred on April 23, 1959, when she apparently forged the signature on a company check in the amount of $39.92. The next defalcation thereafter did not occur until September of

that year. Thereafter, they occurred with increasing frequency but substantially more than half of the total loss occurred more than one year after Kietel had embarked upon her course.

While neither Dial nor Thomas exercised any supervision over or checked upon the bank accounts of the company, the company did have a firm of auditors who made an annual audit of the affairs of the company. Audits for the years 1959 and 1960 did not disclose the defalcations, although they totaled some $6,000 by the end of 1960. Seven of the checks here involved showed that they were examined by the auditor without discovering or reporting anything wrong.

In the spring of 1961 Kietel was discharged for incompetency, and another bookkeeper engaged by the company discovered Kietel's defalcations. The new bookkeeper commenced work in March 1961. Some several weeks after he had discovered certain discrepancies, the bank was asked for assistance by way of photostats of certain checks for use in investigation of the matter. It thus appears that neither the company nor the bank had actual knowledge of any discrepancies until approximately two years after the commencement of the defalcations.

The twenty-one checks involved on the appeal fall into several different categories. We shall first refer to three forged checks, the first thereof being a check in the amount of $39.92, paid on March 23, 1959; another in the amount of $100, paid on November 3, 1959; and still another in the amount of $134.87, paid on December 9, 1959, all of which will hereinafter again be referred to.

One of the checks involved is a check in the amount of $600, dated September 21, 1959, payable to J. E. Outlaw, a trusted employee of the company who was working out of town. Kietel occupied a house which she was renting from the said Outlaw at the rate of $60 a month. She was far in arrears with her rent and this particular check was com-

pleted when signed by Thomas and was not altered in any way. Kietel, however, wrote "J. E. Outlaw" on the back of the check, and deposited it to his account in the Commercial Bank and Trust Company of Columbia, notifying Outlaw of the deposit and telling him that she had made the deposit to cover rent in that amount. Outlaw had no knowledge of the source of the deposit, but the record shows that Kietel had from time to time made deposits to Outlaw's account with his knowledge, and sometimes at his request. No explanation was offered by Thomas as to why he signed the check.

Another check to Outlaw, dated March 14, 1960, originally made out for $50 and signed by Thomas, was raised by Kietel to the sum of $350. The ease with which she was able to alter it will be hereinafter shown in the discussion of various other checks. This check was likewise deposited to the account of J. E. Outlaw in the Commercial Bank and Trust Company, Kietel taking credit with Outlaw for payment in the amount of $300 for rent. Again, Outlaw had no knowledge of the source of the $300, although the deposit slip sent to him showed a single entry in the amount of $350, $50 being due him by the company for expenses.

Two of the checks involved fall into still another category. A check in the amount of $105.80, dated April 18, 1960, payable to C. Bigner, and one for $120.25, dated October 30, 1960, payable to Berry Webb, were properly drawn payroll checks of the company, drawn on its account in the Commercial Bank and Trust Company. The services of both of these employees, however, were terminated before the checks were delivered and they were returned to Kietel for cancellation. Instead of canceling them, she deposited them both to the credit of the company in its account in the respondent bank, taking credit for herself on the books of the company for the total of the two checks against money which Kietel inferentially already owed the company.

If the company suffered any prejudice or loss with respect to these two checks, such does not appear in the record. By

these transactions, money belonging to the company was simply transferred from its account in the Commercial Bank and Trust Company to its account in the respondent bank. If Kietel owed the company money before these transactions, she still owed the company money thereafter; giving herself credit on the books of the company did not change the legal status between Kietel and the company.

The remaining fourteen checks, while varying in some details, fall into one general category or pattern. Mrs. Kietel was apparently in complete and unsupervised custody of the company's checkbooks, checkwriting machine, monthly statements, and canceled checks. She customarily and regularly prepared checks for issuance on the company's printed check forms and presented them to either Mr. Dial or Mr. Thomas for signature, and then they were returned to her and released by her. The company regularly used a checkwriting machine which, among other things, perforated on the line of the check provided for the name of the payee, and, in more or less the center thereof, the word "bonded", the purpose of which was to make it difficult if not impossible to alter the payee without detection. On the line for the amount of the check, the machine imprinted in perforation, for instance, the following:

"Southern States
"Construction Co., $350 and 00 CTS",
the foregoing illustration being the actual amount in one of the checks involved.

The evidence reflects that it was the normal procedure or occurrence for checks to be presented for signature by her which were incomplete in various ways and particularly without having the amount imprinted by the checkwriting machine. A number of the checks were filled out as payable to cash in the amount of $5.00, with the word "cash" being written very lightly at the beginning of the line for the name of the payee, where it would not be caught by the perforation of the checkwriting machine, so that the payee could afterward be easily changed, and with the numeral "5" being so

spaced that Kietel had plenty of room to add additional digits, which she did. She would thereafter imprint the check with the checkwriting machine showing the raised amount of the check, and then negotiate the checks for her benefit in various ways.

None of the checks in this category, nor the others involved on appeal, were paid by the respondent bank over the counter. All of them were either deposited with the respondent bank, or came into the respondent bank for collection from other banks where they had been deposited. One typical instance was a check originally made out to cash in the amount of $5.00, raised to $350.00, endorsed by Kietel and then by Colonial Stores, and deposited with respondent bank. After this particular check cleared the bank, the payee was changed to Southern Brick Cleaning Service Company, the earlier endorsements removed and a purported endorsement by Southern Brick Cleaning Service Company placed thereon by Mrs. Kietel.

Two of the checks were payable to Blackmon Tire Company, with which the company did business, and to whom some money was owed by the company, but Mrs. Kietel raised these two items to cover purchases for her own account, in addition to paying some indebtedness owed by the company to Blackmon Tire Company. Two of the checks involved were payable to South Carolina Electric and Gas Company who deposited the same. They were apparently raised by Kietel to cover her own utility bill as well as that of the company. One was payable to and deposited by Southern Bell Telephone and Telegraph Company. This particular check was substantially raised over and above the amount owed by the company to the telephone company, and just how the difference in the amount inured to the benefit of Kietel does not appear in the record.

In some instances the checks were payable to cash and after they had cleared the bank, payees and endorsements were changed by Kietel. In other instances the payee was

changed from "cash" to a named payee before negotiation. Both the original checks as well as photostatic copies showing their condition when they cleared the bank were in evidence.

While the circumstances varied somewhat as to the various checks and the negotiations thereof, the foregoing should be a sufficient recitation of the evidentiary facts to show the general pattern of defalcation on the part of Kietel.

■ The circuit judge characterized the conduct of the company with respect to all of the checks involved here as constituting extreme negligence, and concluded that such negligence on the part of the company was the real or proximate cause of the losses sustained. We think that the evidence abundantly supports these findings of fact by the circuit judge, confirming similar findings of fact by the master.

A closer question, however, is whether the bank was free of negligence with respect to all of these checks. With respect to a majority of the checks here involved, they were, we think, after careful examination, free of anything on the face thereof that would, under all of the circumstances, give rise to a suspicion on the part of the bank when they were either deposited with the respondent bank or received by the respondent bank from other banks for collection. With respect, however, to several of the checks, they show on the face thereof that some one had changed, altered or corrected the figures written in pen and ink, to the right end of the payee line, to correspond with the amount imprinted by the checkwriting machine. This is true as to two checks payable to the Power Company, the one to the Telephone Company, the checks to Blackmon Tire Company, and a check payable to cash deposited by Kietel in Commercial Bank and Trust Company.

In determining, however, whether one was negligent, all of the circumstances surrounding the transactions have to be considered. Five of these last mentioned checks were en-

dorsed by reputable, solvent business concerns, and the one deposited by Kietel herself came to the respondent bank for collection endorsed by Commercial Bank and Trust Company, none of them showing anything suspicious on the face thereof, other than that the figures written in ink had been corrected to correspond with the amount imprinted on the check by the checkwriting machine.

The Vice-President of respondent bank testified and was cross examined at length as to the degree of care exerted by the respondent bank to prevent honoring forged or altered documents. He had no independent recollection of any of the checks involved in this case, all of them having cleared the bank long before the bank had any actual notice of the defalcations. Among other things, he testified that each check, before being charged against the account of a depositor, was regularly and customarily examined by two bookkeepers for the purpose of verifying signatures and checking for any discrepancies or alterations. He further testified to the effect that the bank cleared some seven or eight thousand checks a day and that there was nothing unusual about receiving checks as to which the digit figures to the right of the check had been improved or corrected for the purposes of either being more legible or corresponding with the amount written in the body of the check. He further testified that where a checkwriting machine was used, the amount imprinted by the checkwriting machine was regarded by the bank as being controlling, if there were any discrepancy between that amount and the digits written to the right of the check.

A Vice-President of the Commercial Bank and Trust Company testified, among other things, as follows:

"The amount shown in the body of the check, if there is any doubt, governs the amount. By the body I mean where the machine has imprinted. I suppose it is impossible to alter that kind of checkwriting imprint, where it both prints and cuts the paper. I hope so. Yes, all banks rely on it."

The Negotiable Instruments Law, South Carolina Code Section 8-828, provides, *inter alia,* with respect to a negotiable instrument that,

"When the sum payable is expressed in words and also in figures and there is a discrepancy between the two, the sum denoted by the words is the sum payable but if the words are ambiguous or uncertain reference may be had to the figures to fix the amount;"

and also that,

"When there is a conflict between the written and printed provisions of the instrument the written provisions prevail."

The appellant here argues that under the foregoing statutory provisions the handwritten digits on a check should prevail over the amount imprinted by the checkwriting machine, and that the bank should not have honored checks relying on the amount imprinted by the checkwriting machine, (which appellant contends is a "printed provision"), particularly when the handwritten digits showed that they had been altered, improved or corrected.

With respect to these contentions, to treat them inversely, we do not think the imprinting of an amount by a checkwriting machine is a "printed provision of the instrument" within the meaning of the statute as contended by the appellant.

It should be borne in mind that the Code provisions relied upon by the appellant were first adopted in this state in 1914, long before the use of checkwriting machines became so prevalent as it is today. A prime purpose, as we see it, of making a sum payable when expressed in words controlling over the sum payable expressed in figures is the very fact that words are much more difficult to alter. The perforated imprinting by a checkwriting machine, while expressing the sum payable in figures, is even more difficult to successfully alter than a sum payable in written words. Hence, we think reliance upon the amount as expressed by the checkwriting machine, is within the intent and

purpose of the statutory provisions. Certainly reliance there-upon, under all of the circumstances of this case, did not conclusively prove negligence on the part of the bank.

When all of the circumstances reflected by the evidence are considered, we conclude that the master's finding of fact, confirmed by the circuit judge, that the respondent bank was free of negligence, is not without evidentiary support. The circuit judge's general legal conclusions are in accord with what is the clear weight of authority from other jurisdictions dealing with cases factually very similar to the instant case. See annotation in 42 A. L. R. (2d) 1071.

Specific exception is taken to the holding of the trial court with respect to the three forged checks as to which appellant was denied recovery, it being contended that the circuit judge misapprehended the rule in *Hair v. Winnsboro Bank, supra,* because the order of the trial judge contained the following language:

"* * * the Supreme Court of South Carolina has stated that the bank is not liable if the depositor is guilty of negligence in discovering the forgery." Citing the *Hair case.*

It is argued that the circuit judge ignored the proposition that it was incumbent upon the bank to prove not only that the depositor was negligent, but that such negligence was the proximate cause of the loss, and that in the instant case, the evidence showed no prejudice to the bank as a result of the failure of the depositor to timely notify the bank with respect to the first three forgeries. With respect to these, the record is not clear as to whether the bank was or was not prejudiced. Had they been timely discovered and reported by the depositor, the bank may or may not have been able to effect reimbursement. Here, the deposit contract between the company and the bank provided that the company would notify the bank, on or before the fifteenth day of the following month, of any discrepancies in its account, and the monthly statements rendered bore the following language:

452

"Notice, please examine statements at once. If no errors are reported within ten days the account will be considered correct."

The master, however, did not hold the depositor to these contractual provisions.

As above pointed out, the master recommended recovery with respect to two forged checks which were cashed in March and April 1961, but with respect to the three forged checks still involved in this appeal, he found as a fact that one year was a reasonable time in which the company should have discovered the forgeries and notified the bank, and concluded that appellant was estopped by the laches of the depositor from asserting a claim against the respondent bank, because the depositor had not given notice of improper payment of these three checks within one year thereafter. The circuit judge, in discussing this particular phase of the case, said that, under all of the circumstances showing extreme negligence on the part of the company, he regarded the master's conclusion with respect to the five forged checks as quite charitable to the appellant since proper care on the part of the company should have detected the first forgery before other losses were incurred.

The first forgery involved occurred in April 1959, the next did not occur until November of the same year, and the last in December of that year. The three forged checks for which the appellant was denied recovery, totaled in amount $274.79. Certainly, had the first of these forgeries been timely reported when discovered, the last two forgeries for which the bank was held liable and which totaled more than the first three forgeries, would not have occurred. Of course, the judgment against the bank on account of the last two forgeries has not been appealed from, but it must be remembered that subrogation is an equitable right.

"The right to recover from a third person does not stand on the same footing as the right to recover from a principal. As to the latter the right is absolute; as to the former it is

conditional. But since the object of subrogation is to place the charge where it ought to rest by compelling the payment of the debt by him who ought in equity to pay it, it will generally not be enforced against a third person where the equities of such third person in respect to the payment of the liability in question are equal or superior to those of the surety with respect to the same liability." 50 Am. Jur. 754, Subrogation, Section 111.

In accord with the foregoing general rule is the language of this court in the recent case of *W. Wesley Singletary & Son, Inc., v. Lake City State Bank,* 243 S. C. 180, 133 S. E. (2d) 118, wherein it was said, ·

"On the other hand, a surety on an employee's fidelity bond upon payment of a covered loss, has no right of recovery against a third person merely upon proof that the protected employer could have recovered from such person."

Hence, even if the circuit judge misconstrued or misapplied the rule in the *Hair case* (and it is not at all clear that he did), at least with respect to the three forged checks under consideration, equities of the respondent bank are superior to those of the appellant. Respondent bank has been found free of any negligence as a matter of fact, and obtained no benefit from the forgeries. The appellant, a paid surety, has already recovered on two forgeries which would not have occurred had the depositor used due diligence and discovered the earlier forgeries in a reasonable time and reported the same to the respondent bank.

Appellant contends that in addition to the sum of $336.31 for which judgment was granted appellant, it is entitled in connection therewith to have included in said judgment interest upon the amount of each of the two checks, for which it recovered judgment, from the dates of the payment of the respective checks. In support of this contention there is cited 9 C. J. S., Banks and Banking § 353, p. 722; 10 Am. Jur. (2d) 839, Banks, Section 418. Also cited in support of this contention is *Carroll v. South*

*Carolina National Bank, supra,* wherein interest in a similar case was apparently allowed as a matter of course and was not contested. No similar case from this jurisdiction where the question of interest was contested has been cited, and none has come to our attention. Respondent's brief does not argue this question. Since this particular issue is apparently not contested by respondent, and the *Carroll case, supra,* at least persuasively supports the contention of the appellant in this respect, we are inclined to decide this contention in favor of the appellant.

For the reasons hereinabove set forth, all other exceptions are overruled. Except for the inclusion of interest on the two checks which are the basis of the judgment in favor of the appellant below, the judgment of the lower court is hereby affirmed.

Affirmed as modified.

TAYLOR, C. J., and MOSS, LEWIS and BRAILSFORD, JJ., concur.