ST. PAUL FIRE AND MARINE INSUR-
ANCE COMPANY, Aubrey, Inc.,
Defendants–Appellants,

v.

STATE BANK OF SALEM,
Plaintiff–Appellee.

No. 1–879A208.

Court of Appeals of Indiana,
First District.

Nov. 5, 1980.

Rehearing Denied Dec. 3, 1980.

Charles W. Linder, Jr., Michael C. Peek, Linder & Taylor, Indianapolis, for St. Paul Fire and Marine Insurance Co.

Andrew H. Wright, Salem, M. Brooks Senn, D. Paul Alagia, Jr., Barnett & Alagia, Louisville, Ky., for Aubrey, Inc.

William L. Thompson, Salem, for State Bank of Salem.

NEAL, Judge.

## STATEMENT OF THE CASE

This action was brought by the State Bank of Salem (Bank) against the drawer of a check, Aubrey, Inc. (Aubrey), and the Bank's insurer, St. Paul Fire and Marine Insurance Company (St. Paul), under a bankers blanket bond. Following a trial to the court without intervention of a jury, judgment was entered in favor of the Bank and against Aubrey and St. Paul. Judgment was also entered in favor of St. Paul on its cross claim against Aubrey. Aubrey and St. Paul appeal the award in favor of the Bank; Aubrey appeals the judgment in favor of St. Paul on its cross claim.

We affirm in part and reverse and remand in part.

## STATEMENT OF THE FACTS

The facts most favorable to the judgment and relevant to our consideration of this appeal are largely undisputed and reveal the following.

On November 26, 1975, Stephens, a farmer, delivered and sold 184 bushels of corn to Aubrey for $478.23. Aubrey was engaged at the time in the sale and distribution of feed and grain in Louisville, Kentucky, under the name of Aubrey Feed Mills, Inc. The following day, Aubrey prepared its check payable to Stephens in payment for the corn and mailed it to Stephens. The check was prepared in the following fashion: the amount "478.23" was typewritten upon the line customarily used to express the amount of the check in numbers, abutting the printed dollar sign. On the line customarily used to express the amount in words there appeared "The sum of $100478 and 23 cts," which was imprinted in red by a checkwriting machine; the line ended with the printed word "Dollars."

On December 9, 1975, Stephens appeared at the Bank's branch in Hardinsburg, Indiana, and presented the Aubrey check and two other items totalling $5,604.51 to the branch manager Charles Anderson. Stephens told Anderson that he wished to apply these funds to the amount of his indebtedness to the Bank, to withdraw $2,000.00 in cash, and to deposit the balance in his checking account. During the interval between November 27, 1975, and December 9, 1975, someone had typed on the check the figures "100" immediately before the typed figures "478.23." This was rather crudely done, and involved typing the "100" in an uneven line; the second "0" was typed directly over the printed dollar sign on the check.

Anderson questioned Stephens about the Aubrey check since Stephens's prior dealings with the Bank had not involved transactions in the amount represented by the Aubrey check. Anderson also knew that Stephens had filed a voluntary petition in bankruptcy several months prior, but had subsequently reaffirmed his obligations to the Bank. Stephens explained that he had purchased a large quantity of corn in northern Indiana and had sold it in Kentucky at a higher price. Evidently satisfied with his explanation, Anderson stamped nine promissory notes, of which Stephens was maker, "paid" and returned them to Stephens. Anderson then directed a teller at the Bank to fill out a deposit slip for the transaction. At that point, neither Anderson nor the teller noticed the typewritten modification on the check. The transaction consisted of applying the funds represented by the three items in the deposit ($106,082.74) to Stephens's debt represented by the nine promissory notes ($31,851.81), an installment payment, of which Stephens was a joint obligor, of $27,559.27,[1] accrued interest owed the Bank by Stephens in the amount of $5,265.65, and the $2,000 cash given to Stephens. The balance was credited to Stephens's account. Stephens then left the Bank.

Later that afternoon, Anderson began thinking about the transaction and examined the items in the deposit. He noted

1. The other obligor assumed liability on this debt and it is not a part of this lawsuit.

that Aubrey's check bore signs of possible tampering and contacted Aubrey's office in Louisville to inquire about the validity of the check. An Aubrey representative told Anderson that a check in that amount was suspicious, and Anderson then "froze" the transaction. The next day, Aubrey stopped payment on the check.

Thereafter, the Bank attempted to recover possession of the nine promissory notes from Stephens but was unsuccessful. Stephens subsequently left Hardinsburg and his present whereabouts are unknown.

After freezing Stephens's account, the Bank reversed the December 9, 1979, transaction by applying the $5,604.51 then on deposit in Stephens's account (said sum representing the amount of the two checks deposited on December 9, 1979 with Aubrey's check) against the $2,000 paid to Stephens in cash on December 9, 1979, and crediting the remaining $3,604.51 against the aggregate principal balance of the nine promissory notes delivered to Stephens on that date. As a result, the Bank claimed a loss of $28,193.91 and made demand therefor upon Aubrey and upon St. Paul. Such demands were refused, and this action followed.

### ISSUES—AUBREY

The issues raised by Aubrey differ from those raised by St. Paul and we shall consider them separately. We first address Aubrey's issues, which are presented for review as follows:

I. Whether the holder of a check (the Bank) can recover from the check's maker (Aubrey) who has "stopped payment" on the check where such holder is not a "holder in due course" because it not only did not take the check "for value" but took it with notice of a defense to the check on the part of the maker;

II. Whether the maker (Aubrey) of an altered check is precluded from asserting the alteration against a subsequent holder of the check (the Bank) which is neither a "holder in due course" of such check nor a payor thereof who has paid the instrument in good faith and in ac-

cordance with the reasonable commercial standards of its business;

III. Whether the obligation of a debtor (Stephens) is discharged when the creditor (the Bank) is induced by the debtor's fraud to surrender possession of the debtor's promissory notes evidencing the indebtedness;

IV. Whether the issuer (St. Paul) of a bankers blanket bond is entitled to be subrogated to the right of the insured under such bond (the Bank) against a third party (Aubrey) where absolutely no evidence was introduced at the trial showing that such issuer was entitled to subrogation.

### DISCUSSION AND DECISION—AUBREY

*Issue I.*

The trial court did not enter any findings to enlighten us as to the basis of its judgment in favor of the Bank. We must, as a reviewing court, uphold the trial court's action on any valid legal theory supported by the evidence. *Charlie Stuart Oldsmobile, Inc. v. Smith,* (1976) Ind.App., 357 N.E.2d 247. We may reverse the judgment of the trial court only when such judgment is clearly erroneous. *Tarrant v. Self,* (1979) Ind.App., 387 N.E.2d 1349. A judgment is clearly erroneous when the evidence and reasonable inferences therefrom are undisputed and could only lead to a decision contrary to that of the trial court. *Blaising v. Mills,* (1978) Ind.App., 374 N.E.2d 1166.

We think the only issue dispositive of Aubrey's appeal is whether the trial court could rightfully have found on the evidence that the Bank was a holder in due course of the Aubrey check under the Uniform Commercial Code (U.C.C.) as adopted in Indiana. Hereinafter all references to U.C.C. sections will be designated by the appropriate chapter number followed by the section number, as found in Title 26, Article 1 of the Indiana Code. Thus, for example, § 3–302 refers to Ind. Code 26–1–3–302.

The Bank's right to recover on the check is conditioned upon its status as a holder in due course of the check. Section 3–305 states in part:

"To the extent that a holder is a holder in due course he takes the instrument free from

(1) all claims to it on the part of any person; and

(2) all defenses of any party to the instrument with whom the holder has not dealt except . . . ."

Assuming, without presently deciding, that Aubrey showed the existence of a defense, the burden was on the Bank to prove by a preponderance of the evidence that it was in all respects a holder in due course of the check. § 3–307(3).[2]

Section 3–302(1) defines a holder in due course as a holder who takes an instrument

"(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

There is no contention on appeal, and there was none at trial, that the Bank did not take the Aubrey check in good faith, which means honesty in fact in the transaction concerned. § 1–201(19). There is also no question that the Bank was a holder of the instrument, as it was in possession of the check indorsed by the payee Stephens in blank. See § 1–201(20).[3]

■ We initially consider whether the Bank took the Aubrey check for value. The Bank contends that it gave value for the check to the extent that it (a) acquired a security interest in the instrument under §§ 3–303(a), 4–208, and 4–209; and (b) took the check in payment of an antecedent claim under § 3–303(b). Aubrey contends that the Bank did not take the check for value since it immediately froze Stephens's account upon apprisal that the validity of the check was suspect and cancelled the

amounts it had credited against Stephens's debt. Aubrey considers that the Bank's action in crediting Stephens's debt on the notes merely constituted a bookkeeping procedure and the Bank did not change its position by doing so, particularly since the Bank could still maintain an action against Stephens on the notes. Finally, Aubrey maintains that general principles of law and equity render the U.C.C provisions relied on by the Bank inapplicable.

We are of the opinion that the Bank took the check for value. The issue is most readily resolved by § 3–303(b) which states in part:

"A holder takes the instrument for value

\* \* \* \* \* \*

(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; . . ."

The statute plainly states that value is given for an instrument when the instrument is taken in payment for an antecedent debt not yet due. The statute contains no provision precluding application of the rule when fraud is exercised by the presenter of the instrument, as Aubrey would have us find.

While this section has not been construed in Indiana, an examination of authorities from other jurisdictions lends support to the Bank's position that the application of funds made available by the Aubrey check to Stephens's indebtedness and the surrender of the notes constituted taking the instrument for value.

In *Citizens Bank, Booneville, Arkansas v. National Bank of Commerce, Tulsa, Oklahoma,* (10th Cir. 1964) 334 F.2d 257, an Arkansas bank accepted from its debtor, in payment of a note, a check payable to the debtor drawn on an Oklahoma bank. The bank delivered the debtor's note to him.

---

**2.** § 3–307(3) states:

"After it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course."

**3.** Sections 1–201(19) and (20) state:

"(19) 'Good faith' means honesty in fact in the conduct or transaction concerned.

(20) 'Holder' means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or endorsed to him or to his order or to bearer or in blank."

The Arkansas bank presented the check to the Oklahoma–drawee bank, which accepted the check and issued its cashier's check in payment. Later that day, the Oklahoma bank discovered that the check presented by the Arkansas bank bore a forged drawer's signature and dishonored the cashier's check. The Arkansas bank then brought an action against the Oklahoma bank on the cashier's check. The Oklahoma bank argued, as Aubrey does here, that since the Arkansas bank had recourse against its depositor, notwithstanding discharge of the debt, it could not recover from the Oklahoma drawee bank on the cashier's check. Reversing the trial court, the Court of Appeals held that the Arkansas bank was a holder in due course, stating, "Undoubtedly, credit was given for the forged check by the discharge of the pre–existing debt," 334 .F.2d at 261, and recognizing the prevailing rule, "if the negotiated instrument is taken in satisfaction of an antecedent debt, the taker is a holder for value and in due course." *Id. See also, Leininger v. Anderson,* (1977) Minn., 255 N.W.2d 22; *Nicklaus v. Peoples Bank & Trust Company, Russellville, Arkansas,* (E.D.Ark.1965) 258 F.Supp. 482.

Further, we believe that the Bank gave value for the check under §§ 4–208(1) and 4–209, in that it acquired a security interest in the check to the extent funds represented thereby were applied to Stephens's debt. Section 4–208(1)(a) states in part:

"(1) A bank has a security interest in an item and any accompanying documents or the proceeds of either

(a) in case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied; . . ."

Section 4–209 provides:

"For purposes of determining its status as a holder in due course, the bank has given value to the extent that it has a security interest in an item provided that the bank otherwise complies with the requirements of section 3–302 on what constitutes a holder in due course.".

In *Waltham Citizens National Bank v. Flett,* (1968) 353 Mass. 696, 234 N.E.2d 739, a depositary bank allowed its depositor, at the time he deposited a check upon which payment was later stopped, to draw a check against those funds in satisfaction of a note which the bank returned to the depositor. The court found the bank to have given value for the former check, apparently considering the bank to have "applied" credit against the deposited check under § 4–208(1)(a). One commentary has suggested that the bank's delivery of the note to the depositor may have been determinative of the value issue. B. Clark & A. Squillante, The Law of Bank Deposits, Collections, and Credit Cards 85 (1970).

 We find no support for Aubrey's argument that the Bank did not give value since it did not change its position vis–a–vis Stephens and made a bookkeeping entry only of the credit given Stephens. Aubrey appears to liken the transaction under review to the situation arising when a bank provisionally credits a depositor's account pending final settlement of a deposited item. It is true that the giving of provisional credit, which has not ripened into credit available for withdrawal as a matter of right, and nothing more, does not constitute the giving of value for deposited item. § 4–208(1)(a); *Universal C.I.T. Credit Corporation v. Guaranty Bank and Trust Company,* (D.Mass.1958) 161 F.Supp. 790. Official Comment 3 to § 3–303 states that it is not necessary to give holder in due course status to one who has not actually paid value, and cites as illustration "the bank credit not drawn upon, which can be and is revoked when a claim or defense appears." West's AIC 26–1–3–303. When the credit is drawn upon, however, value is given to that extent. § 4–208(1)(a). Further, if the depositor's account is overdrawn at the time the check is taken, and funds represented thereby are applied to the overdrawal by way of set–off, value is given to that extent if the check is later dishonored. *Laurel Bank & Trust Company v. City National Bank of Connecticut,* (1976) 33 Conn.Supp. 641, 365 A.2d 1222; *See* Annotation, 59 A.L.R.2d 1173.

We have been directed to two cases in which appellate courts have held that value was not given. Aubrey relies on *Coconut Grove Bank v. M. R. Harrison Construction Corporation*, (Fla.App.1969) 226 So.2d 120. In that case, the depositor deposited a check drawn to his order in his account at the bank. The bank allowed the depositor to withdraw some funds against the check. Further, the depositor drew two checks payable to the bank to be applied to a loan not then due, and the bank applied that amount on its books to the depositor's loan account. The drawer of the check stopped payment thereon, and upon notice thereof, the bank reversed its bookkeeping entry and destroyed the credit given toward the debt. The bank prevailed as to the former amount, but was denied recovery on the latter. The court did not consider whether § 3–303(b), the section stating that taking an instrument in payment for an antecedent claim is value, applied in the case. Further, the opinion does not state whether the note evidencing the debt was returned to the depositor. We do not consider this case to be controlling on the issue.

In *Marine Midland Bank–New York v. Graybar Electric Company, Inc.*, (1977) 41 N.Y.2d 703, 395 N.Y.S.2d 403, 363 N.E.2d 1139, the bank was held not to have given value for a check deposited by its depositor. The bank had provisionally set off the amount of that check against its depositor's indebtedness. The court noted that the note had not been returned to the depositor and indicated in *dicta* that had the note been returned, a different result might have been obtained. The case, then, is clearly distinguishable.

We hold that the Bank in the instant case gave value for the Aubrey check to the extent that funds represented thereby were applied to Stephens's note.

We find no support for Aubrey's contention that the fraud exercised by Stephens vitiates the application of the U.C.C. sections that are controlling here. Aubrey set this mischief afoot by its own carelessness in preparing the check, using the checkwriting machine, for the higher amount and placing it into circulation. Our finding is in accord with the purposes of the U.C.C. provisions under consideration, which have been characterized as preventing "the hinderance to commercial transactions which would result if depository banks refused to permit withdrawal prior to clearance of checks." *Laurel Bank and Trust Company, supra,* 365 A.2d at 1225. Our task is to construe the provisions of the U.C.C. liberally and apply them to promote the underlying purposes and policies of the Code, which include "to simplify, clarify, and modernize the law governing commercial transactions." Sections 1–201(1) and (2); *Insurance Company of North America v. Purdue National Bank of Lafayette,* (1980) Ind.App., 401 N.E.2d 708, 714.

Aubrey vigorously contends the Bank was not a holder in due course of the check because, under the objective standard imposed upon the Bank by § 3–304(1), the Bank took the check with notice of a defense to the check on the part of Aubrey. Aubrey argues the evidence of alteration on the face of the check and the irregular circumstances attending the transaction were such as to put a reasonably prudent banker, exercising normal commercial standards, on notice. The circumstances alleged to have imparted notice to Bank include the small size of Stephens's farming operations, Stephens's banking history including frequent indebtedness and overdrawals, the Bank's knowledge of Stephens's petition in bankruptcy, the size of the Aubrey check in relation to typical transactions undertaken by the Bank, and the implausibility of Stephens's explanation to Anderson, himself familiar with farming, of the transaction underlying Stephens's receipt of the check. The Bank concedes the U.C.C. imposed an objective standard of conduct upon it in the transaction. The essence of the Bank's contention is that the matter of the Bank's notice is a question of fact, and the trial court's implicit finding that the Bank took the check without notice of Aubrey's defense was not erroneous.

The general notice provision of the U.C.C. is stated in § 1–201(25), which provides in part:

"A person has 'notice' of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists."

Section 3–304, titled "Notice to Purchasers," states in part:

"(1) The purchaser has notice of a claim or defense if

(a) the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay; ..."

The Bank is a "purchaser" within the meaning of § 3–304. *See seriatim* §§ 1–201(33), 1–201(32), 3–202, 1–201(20), 3–102(1)(e).

■ Section 1–201(25) imposes subjective and quasi–objective standards; § 3–304 imposes an objective standard. *See, Western State Bank of South Bend v. First Union Bank & Trust Company of Winamac,* (1977) Ind.App., 360 N.E.2d 254. An irregularity on the face of an instrument is sufficient to impart notice under § 3–304(1)(a) where,

"A reasonably prudent person exercising normal commercial standards would immediately be put on notice that there was something very irregular about the terms of the [instrument.]"

*First National Bank of Linton v. Otto Huber and Sons, Inc.,* (USDC, D.S.Dak.1975) 394 F.Supp. 1284, 1287, cited in *Western State Bank of South Bend, supra,* 360 N.E.2d at 256.

The gist of Aubrey's argument is that the alleged "alteration" on the face of the check, i. e. the typed figure "100," was "such visible evidence" of alteration as to call into question its validity or terms. We do not think that the trial court erred as a matter of law in finding that the Bank took the Aubrey check without notice of a defense.

The Bank's branch manager, Anderson, with whom Stephens dealt in the transaction, admitted that he took the check without comparing the amount expressed by the checkwriting machine with the amount expressed in typewritten figures; indeed, he testified that he did not even look at the figures. He relied, instead, upon the amount expressed by the checkwriter that was entered upon the line generally used to express the amount of a check in words.

Section 3–118, captioned "Ambiguous terms and rules of construction," states in part:

"The following rules apply to every instrument:

\* \* \* \* \* \*

(b) Handwritten terms control typewritten and printed terms, and typewritten control printed.

(c) Words control figures except that if the words are ambiguous figures control."

Official Comment 1 to § 3–118 states: "The purpose of this section is to protect holders and to encourage the free circulation of negotiable paper by stating rules of law which will preclude a resort to parol evidence for any purpose except reformation of the instrument. Except as to such reformation, these rules cannot be varied by any proof that any party intended the contrary."

West's AIC § 26–1–3–118. The holder is thus able to take an instrument confident that he will be able to enforce the instrument according to the written terms without having to bring in the original parties to the instrument to ascertain the intended amount.

■ As the section makes clear, in the event of an ambiguity between printed terms and typewritten terms, the latter would control. We do not consider the impressions made by the check imprinter to be "printed" terms under this section. Accord, *United States Fidelity and Guaranty Company v. First National Bank of South Carolina of Columbia,* (1964) 244 S.C. 436, 137 S.E.2d 582, 589.

■ A conflict between the two amounts on a check would be resolved by § 3–118(c) which states that words control figures.

Arguably, the amount imprinted by the checkwriting machine upon the line customarily expressing the amount in words, is expressed in figures. (Recall that the entry reads: "The sum of $100478 and 23 cts.") We think, however, that the purposes of the U.C.C. are best served by considering an amount imprinted by a checkwriting machine as "words" for the purpose of resolving an ambiguity between that amount and an amount entered upon the line usually used to express the amount in figures.

Two purposes behind the rule that words control figures have been expressed which support the proposition expressed here, i. e. that impressions made by checkwriting machines upon the "words" line control typed or written figures. In *United States Fidelity and Guaranty Company v. First National Bank of South Carolina of Columbia, supra,* it is stated:

> "A prime purpose, as we see it, of making a sum payable when expressed in words controlling over the sum payable expressed in figures is the very fact that words are much more difficult to alter. The perforated imprinting by a checkwriting machine, while expressing the sum payable in figures, is even more difficult to successfully alter than a sum payable in written words."

137 S.E.2d at 589. Earlier, in *Payne v. Commercial National Bank of Los Angeles,* (1917) 177 Cal. 68, 169 P. 1007 at 1008, the court said:

> "The theory is that a man is more apt to commit an error with his pen in writing a figure than in writing a word, and that the words ought to be deemed the better and more solemn statement, and therefore should govern."

169 P. at 1008. Accord, *Industrial Machinery, Inc. v. Creative Displays, Inc.,* (1977) Ala., 344 So.2d 743.

In *United States Fidelity & Guaranty Company, supra,* a pre–U.C.C. case, a bank was presented with several checks upon which the amount in figures on the line generally used for figures had been "changed, altered, or corrected" to conform to the amount imprinted by a checkwriting

machine on the line generally used for words. The former amount was handwritten in pen and ink. A question on appeal concerned the issue of the bank's negligence in accepting the checks in that condition. The court looked to the Negotiable Instruments Law which provided that upon a discrepancy between words and figures, the words control. The court found that the bank's action in relying on the amount as imprinted by the checkwriter did not conclusively amount to negligence.

■ We cannot say as a matter of law that the bank acted unreasonably in relying upon the amount expressed by the checkwriting machine. Aubrey presented no evidence that customary banking standards require a bank to closely examine and compare the two amounts on the check, and it was Aubrey's burden to prove the existence of such custom. *Western State Bank of South Bend, supra.* The issue of the Bank's constructive knowledge of any defense Aubrey may have had to the check, based on the alleged irregularity on the face of the check, was a question of fact for the trial court to determine. It was not error for the court to have determined that the Bank acted reasonably in relying on the amount imprinted by the checkwriting machine and took the check without notice, actual or constructive, of a defense thereto.

■ Aubrey further argues that the circumstances surrounding the transaction were so irregular as to put a reasonably prudent banker on notice of a defense to Aubrey's check. Aubrey directs us to no cases in which a holder was denied holder in due course status because of its knowledge of the questionable general financial position of the presenter of the instrument. Our research reveals that such knowledge is not sufficient in itself to defeat holder in due course status. *See, e. g., St. Cloud National Bank & Trust Company v. Sobania Construction Company, Inc.,* (1974) 302 Minn. 71, 224 N.W.2d 746 (knowledge that payee–depositor had a bad financial record, had overdrawn his account, or was otherwise a "bad risk" not sufficient to deny holder in due course status to depositary

bank in suit against drawer of check who had stopped payment thereon). In *Texico State Bank v. E. U. Hullinger*, (1966) 75 Ill.App.2d 212, 220 N.E.2d 248, the court considered that the fact a bank knew that the payee's credit was such that his own checks "bounced with regularity all over the place" was not germane to the issue of whether the bank took a particular check with notice of an infirmity in that check. The court said, "Whatever may have been [the payee's] financial record, it had nothing to do with the integrity of [the drawer's] checks or with any notice express or implied that the [drawer] could not or would not honor his commercial paper or that any person had a defense against or claim to any part of them." 220 N.E.2d at 250. The only knowledge the Bank had concerning the transaction underlying the issue of the Aubrey check to Stephens, and thus the only knowledge relevant to the issue of Bank's notice of a possible defense to the check, grew out of Stephens's explanation to Anderson of how the check came into his hands. This was not sufficient to call into question the integrity of the Aubrey check.

We therefore hold that the evidence supports the trial court's determination that the Bank was a holder in due course of the Aubrey check. Since Aubrey has not shown a "real defense" under § 3–305(2) the Bank may enforce the check against Aubrey to the extent it gave value therefor, and we shall not disturb the trial court's award of that amount.

*Issues II, III, and IV.–Aubrey*

Our finding that the Bank was a holder in due course of the Aubrey check obviates the consideration of Aubrey's second issue.

As to Aubrey's third issue, our determination that value was given for the check by the Bank, notwithstanding any right it may have against Stephens to enforce the notes, renders Aubrey's argument that the Bank suffered no loss incorrect.

Aubrey's fourth issue is well–taken. In our disposition of St. Paul's appeal, *infra*, we reverse the judgment against St. Paul, and consequently, vacate the judgment in favor of St. Paul on its cross claim against Aubrey.

ISSUES–ST. PAUL

St. Paul presents two issues for review as follows:

V. The judgment against St. Paul is erroneous in that the Bank has suffered no "loss" as a result of this transaction because the maker of the check is still liable to the Bank and/or because the debtor, James Stephens, remains liable on his debt to the Bank regardless of whether the Bank possesses evidence of his indebtedness in the form of notes;

VI. The judgment against St. Paul is erroneous because the bankers blanket bond does not cover loss caused by the Bank's own negligence.

DISCUSSION AND DECISION–ST. PAUL

*Issues V and VI.*

■ Since we reverse the trial court's judgment against St. Paul, we shall consider only Issue V, which raises the question of St. Paul's liability on the bankers blanket bond entered into between St. Paul and the Bank.

Regarding the fifth issue, the Bank contends it is entitled to judgment by reason of the policy issued by St. Paul which insured against loss to the Bank by reason of acceptance of an altered instrument as provided by coverages D and E of the bond. Those sections stated in pertinent part:

"(D) FORGERY AND ALTERATION OF CHECKS, DRAFTS, ETC.

The Underwriter agrees to indemnify the insured ... for any loss through forgery or alteration of, on or in any checks ...; or (2) through the payment by the insured of promissory notes ... and which are actually paid by the Insured out of funds on deposit with it, which prove to be forged or altered.

. . . . .

**(E) FORGERY AND ALTERATION OF SECURITIES, ETC.**

The Underwriter agrees to indemnify the Insured . . . for any loss (1) through the Insured's having in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon, any security, document or other written instrument which prove to have been . . . (b) raised or otherwise altered."

The Bank maintains it suffered a loss by reason of the "altered" Aubrey check.

We do not think the "alteration" allegedly performed by Stephens upon the check was a material alteration of the instrument. Section 3–407(1) reads as follows:

"Any alteration of an instrument is material which changes the contract of any party hereto in any material respect, including any such change in

(a) the number or relations of the parties; or

(b) an incomplete instrument, by completing it otherwise than as authorized; or

(c) the writing as signed, by adding to it or by removing any part of it."

Official Comment 1 to § 3–407 states, in part:

"Any alteration is material only as it may change the contract of a party to the instrument; and the addition or deletion of words which do not in any way affect the contract of any previous signer is not material. But any change in the contract of a party, however slight, is a material alteration; and the addition of one cent to the amount payable, or an advance of one day in the date or payment, will operate as a discharge if it is fraudulent."

West's AIC § 26–1–3–407.

Thus a change in the amount of a check is a material alteration. In the instant case, it is contended by Aubrey, and apparently conceded by the Bank, that Stephens, or another, typed in the figures "100" immediately before the figures "478.23" that Aubrey had typed on the check, so as to type over the printed dollar sign. On the line used to express the amount of the check in words, Aubrey used a check imprinter to enter: "The sum of 100478 and 23 cts." Our question then becomes, did the change of the amount of the check in figures operate to change the contract of the drawer, so as to satisfy the basic test of materiality?

Section 3–118, *supra*, states that words control figures. In effect, Stephens typed the figures "100" onto the check so as to change the amount of the check in figures to conform to the amount of the check as expressed by the checkwriter in the space generally used to express the amount in words.

One commentator has stated, "Logically, an alteration on the amount in figures alone should not be considered as changing the contract of the instrument or the effect thereof, and should therefore not be regarded as material." BAILEY, BRADY ON BANK CHECKS 21–5 – 21–6 (5th Ed. 1979). It is interesting to note that in the contemplation of the criminal law, by the weight of authority, the alteration of figures on a check, bill, or note, stating the amount thereof, without changing the words expressing the amount, does not constitute forgery because a change in the figures alone is not a material alteration in the instrument. *See* Annotation, 64 A.L. R.2d 1029.

The Bank would have us adopt a different interpretation of alteration but we think that the meaning of the term under the U.C.C. is appropriate here. It is difficult to see how one could suffer a loss due to an alteration that is not material, and the Bank shows us none.

The loss, if any, suffered by the Bank was not occasioned by an alteration, but rather by the stop payment order. The Bank does not contend that such a loss was covered by the bond. The judgment of the trial court was, therefore, erroneous in find-

ing that St. Paul was liable on the bond for any loss incurred by the Bank.

This cause is reversed and remanded with instructions to vacate the judgment entered in favor of the Bank against St. Paul, and to vacate the judgment the favor of St. Paul in its cross claim against Aubrey. The judgment is in all other respects affirmed.

Affirmed in part; reversed and remanded in part.

ROBERTSON, P. J., and RATLIFF, J., concur.